*75 OPINION OF THE COURT
Rosenblatt, J.
In this common-law defamation action, plaintiffs seek compensatory and punitive damages against a municipality, alleging that they were defamed by an independent programmer on the municipality’s public access television channel. The issue before us is whether 47 USC § 555a (a) immunizes the municipality from liability for monetary damages. Under that section, immunity extends to any claim against a municipality “arising from the regulation of cable service.” We conclude that plaintiffs’ claim arises from the regulation of cable service, and therefore uphold dismissal of the complaint against the municipality.
Facts and Procedural History
Defendant Town of Woodstock (the municipality) granted non-party Kingston Cablevision, Inc., a franchise for the construction and operation of a cable television system. In the franchise agreement, Kingston Cablevision agreed to provide public access capability to the municipality.[1] The agreement further provided that “[r]ules and regulations for use of the public access capability shall be promulgated by [the municipality].”
In accordance with that provision, the municipality promulgated regulations (the Regulations) and delegated management of the channel to defendant Woodstock Public Access Committee (the WPAC), a body consisting of five people chosen by the municipality’s Town Board. Among the Regulations is a provision prohibiting the presentation of material that constitutes libel, slander or invasion of privacy. The municipality’s Regulations further provide that “[w]hen program violations are brought to the attention of the WPAC, it may take such steps that are necessary to comply with WPAC regulations, and applicable local, state and federal laws and regulations.”
Shortly after the public access channel began broadcasting, Ronald Rybacki produced and appeared in his own weekly television program on its airwaves. Plaintiff Elizabeth Caprotti, *76 who had briefly dated Rybacki, alleges that he used his program to wage a vicious campaign of harassment against her by repeatedly defaming her and her three sons — also plaintiffs in this action — on television. Plaintiffs assert that despite their complaints to members of the municipality’s Town Board and WPAC, the municipality refused to stop Rybacki’s defamatory broadcasts, and thereby willfully failed to comply with the Regulations, The nature of these allegations is not in dispute. Indeed, Rybacki reportedly was prosecuted criminally for harassing the plaintiffs, and an order of protection was issued against him prohibiting him from discussing plaintiffs on the air.
Plaintiffs sued the municipality, members of its Town Board, the WPAC, members of the WPAC, the channel’s station manager (collectively, the municipal defendants) and Rybacki, seeking compensatory and punitive damages for common-law defamation. Rybacki defaulted, and a judgment was entered against him. Supreme Court held that 47 USC § 555a (a) clothed the municipal defendants with immunity from liability for monetary damages, and the Appellate Division unanimously affirmed. We agree with the reasoning of the courts below, and, therefore, affirm.
Statutory Analysis
The Cable Communications Policy Act of 1984 (the 1984 Act) was the first comprehensive Federal statute regulating the cable television industry. A stated, primary purpose of the legislation was to “assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public” (47 USC § 521 [4]). In keeping with that aim, Congress sought to insure that cable companies devote portions of their systems to programming over which the companies had no editorial control, thereby providing the public with additional avenues of information (see, Note, Denver Area Telecommunications Consortium, Inc. v. FCC And The Public Forum Status Of Cable Access Channels, 63 Brook L Rev 955, 961-962 [Fall 1997]).[2]
The 1984 Act furthered the objective by empowering a local municipality, as franchisor, to require that a cable operating *77 company establish “public access channels” (i.e., channels that are operated by the local municipality and are not controlled by the cable operator). [3] Congress envisioned that public access channels would become “the video equivalent of the speaker’s soapbox or the electronic parallel to the printed leaflet” (HR Rep No. 98-934, 98th Cong, 2d Sess, at 59, reprinted in 1984 US Code Cong & Admin News 4655, 4696).
By placing municipalities in the regulatory arena, however, the 1984 Act exposed them to numerous lawsuits brought by cable companies asserting that their First Amendment rights were violated when they were not awarded municipal cable contracts (see, S Rep No. 102-92, 102d Cong, 2d Sess, at 48-49, reprinted in 1992 US Code Cong & Admin News 1133, 1181). Thus, when Congress restructured the 1984 Act and passed the Cable Television Consumer Protection and Competition Act[4] in 1992, it included section 555a (a), which provides that
“[i]n any court proceeding * * * involving any claim against a franchising authority or other governmental entity * * * arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief ’ (47 USC § 555a [a] [emphasis added]).
The issue before us is whether plaintiffs’ tort claim, which is predicated on the municipal defendants’ decision to allow Ry *78 backi to continue broadcasting defamatory speech, “aris[es] from the regulation of cable service” and is therefore defeated by the immunity provision.
By its plain and unconditional terms, section 555a (a) grants a local municipality broad immunity from monetary liability that arises out of “any” of the municipality’s regulatory decisions involving cable television. We hold that the municipal defendants made a regulatory decision when they allowed Rybacki to continue on the air in the face of persistent complaints. Although we are mindful of the undisputed defamatory nature of Rybacki’s broadcasts, our role is not to decide whether the municipality’s decision was a good one; our focus is limited to whether the municipality “regulat[ed]” cable service, and we conclude that it did.
By statutory grant, the municipality is vested with authority to address allegedly defamatory programming (see, 47 USC § 531 [b]). Based on that authority, the municipality promulgated what it aptly called “Regulations.” By deciding to permit Rybacki to continue his broadcasts on their public access channel, the municipal defendants were engaged in “regulation” of cable service to no less a degree than had they stopped him.
Nothing in section 555a (a)’s legislative history diminishes the breadth of the immunity conferred by the statute’s plain terms. We agree that, as plaintiffs point out, the immunity provision was motivated by the need to protect local franchising authorities “from being pressured into making unmeritorious franchising decisions by the threat of expensive damages litigation by cable companies” (see, 138 Cong Rec H6487, H6530 [July 23, 1992]). Indeed, the original provision passed by the Senate immunized local franchising authorities from monetary liability solely “in cases where the franchising authorities are charged with violating a cable operator’s First Amendment rights arising from actions authorized or required by [the 1984] act” (HR Conf Rep No. 102-862, 102d Cong, 2d Sess, at 98, reprinted in 1992 US Code Cong & Admin News 1231, 1280). The scope of the statute’s immunity was, however, significantly broadened during the course of the legislative process.
In the end, Congress expanded the Senate’s original proposed immunity provision by adopting the significantly broader House amendment. The final version thus extends municipal immunity to “any claim * * * arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer or amendment of a *79 franchise” (see, HR Conf Rep No. 102-862, op. cit., at 99 [emphasis added]). If Congress was concerned exclusively with immunity from suits by aggrieved cable operators, it would not have deliberately enacted the additional sphere of immunity from any claims “arising out of the regulation of cable service.”
The dissent would allow plaintiffs to maintain a defamation action for money damages, concluding that the right to such relief is not preempted by the 1984 and 1992 Acts. We disagree and rest our determination on the plain language of section 555a (a), which except for declaratory and injunctive relief, expressly precludes “any claim against a franchising authority or other governmental entity * * * arising from the regulation of cable service.” Unlike the Federal statutes at issue in cases cited by the dissent, section 555a (a) leaves no room for guesswork or interpretation. Preemption is not implied; it is express. The statute unambiguously preempts “any relief, to the extent that such relief is required by any provision of* * * State, or local law.”
At least one other municipality has successfully invoked section 555a (a) under facts analogous to these. The Eighth Circuit Court of Appeals, in Coplin v Fairfield Pub. Access Tel. Comm. (111 F3d 1395, 1408 [1997]), held that section 555a (a) immunized a municipality from monetary liability in a lawsuit arising out of the municipality’s regulatory decision concerning programming content on its public access channel. In Coplin, however, the municipality decided to ban, rather than continue, a program that aired allegedly defamatory statements (see, Coplin v Fairfield Pub. Access Tel. Comm., supra, at 1400). Like the municipal defendants here, the municipality in Coplin was sued because of the manner in which it regulated its public access channel’s programming (see, Coplin v Fairfield Pub. Access Tel. Comm., supra, at 1400). For purposes of our analysis, we see no meaningful distinction between Coplin and the case at bar. If cable television may be likened to a faucet of public information, one regulates the faucet no less by deciding to let it run than by turning it off.
Accordingly, the order of the Appellate Division should be affirmed, without costs.

. In 1984, Congress enacted the Cable Communications Policy Act (Pub L No. 98-549, 98 US Stat 2779 et seq. [codified as amended in scattered sections of 47 USC]), which expressly permits a “franchising authority” (i.e., a local municipality empowered to grant a cable television franchise) to include in its franchise proposal to a cable operating company a statement that the municipality reserves channels for public, educational or government use (47 USC § 531).

. A “cable operator,” is the entity that “provides cable service over a cable system and * * * owns a significant interest in such cable system” (47 USC § 522 [5]). In the case before us, non-party Kingston Cablevision, Inc., is a “cable operator.”
In the pleadings and in their brief, plaintiffs refer to the municipality as the cable operator. If we were to consider the municipality as the operator, it *77 would not avail plaintiffs, considering that the municipality as “operator” would be covered by the immunity provision of section 558, which provides that “cable operators shall not incur * * * liability for any program carried on any [access channel] * * * unless the program involves obscene material” (47 USC § 558). We base our decision, however, on the immunity provision of section 555a (a).

. See, 47 USC § 531 (b). The 1984 Act authorizes municipalities to require cable operators to provide two types of “access channels”: (1) leased access channels (47 USC § 532), and (2) public access channels (47 USC § 531). Leased access channels are channels that cable operators lease commercially to unaffiliated third parties. On the other hand, public access channels are managed independently by local municipalities. A local municipality is granted a public access channel as a quid-pro-quo for the cable operator being allowed to use the public rights-of-way to construct its cable system (see, Note, 63 Brook L Rev, op. cit., at 960).

. Pub L No. 102-385, 106 US Stat 1460 (codified as amended in scattered sections of 47 USC).